8/9/2022 12:27 PM
22CV23719

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF LANE

| | |
|---|---|
| **CHRISTOPHER NETTLETON**, an individual, | Case No.    22CV23719 |
| Plaintiff, | **SUMMONS** |
| vs. | |
| **EXACT SCIENCES CORPORATION**, a Delaware Corporation, | |
| Defendant. | |

TO:    Exact Sciences Corporation
c/o Corporation Service Company, Registered Agent
1127 Broadway Street NE, Suite 310
Salem, Oregon 97301

IN THE NAME OF THE STATE OF OREGON:  You are required to appear and defend the Complaint filed against you in the above-entitled action within thirty (30) days from the date of service of this Summons upon you, and in case of your failure to do so, for want thereof, the Plaintiff will apply to the Court for the relief demanded in the Complaint.

HUTCHINSON COX

By: _Andrea Coit_____
Andrea D. Coit, OSB #002640
acoit@eugenelaw.com
Of Attorneys for Plaintiff

**NOTICE TO DEFENDANT READ THESE PAPERS CAREFULLY!**

You must "appear" in this case or the other side will win automatically.  To "appear" you must file with the Court a legal document called a "motion" or "answer."  The "motion" or "answer" must be given to the court clerk or administrator within 30 days along with the required filing fee.  It must be in proper form and have proof of service on the Plaintiff's attorney or, if the Plaintiff does not have an attorney, proof of service on the Plaintiff.

If you have any questions, you should see an attorney immediately.  If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

1 – SUMMONS

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 1 of 36**

8/4/2022 11:16 AM
22CV23719

## AFFIDAVIT OF SERVICE

State of Oregon                    County of Lane                    Circuit Court

Case Number: 22CV23719

Plaintiff: **CHRISTOPHER NETTLETON, an individual**
vs.
Defendant: **EXACT SCIENCES CORPORATION, a Delaware corporation**

For:
Andrea Coit
Hutchinson Cox
940 Willamette St, Ste 400
Eugene, OR 97440

Received by Emerald City Legal Support on the 27th day of July, 2022 at 3:38 pm to be served on **EXACT SCIENCES CORPORATION c/o CORPORATION SERVICE COMPANY, Registered Agent, 1127 BROADWAY ST NE, STE 310, SALEM, OR 97301**.

I, Bobby Chandler, being duly sworn, depose and say that on the **28th day of July, 2022** at **11:08 am**, I:

SERVED the within named **EXACT SCIENCES CORPORATION** at **1127 BROADWAY ST NE, STE 310, SALEM, OR 97301** by personally serving a true copy of the **SUMMONS AND PLAINTIFF'S FIRST AMENDED COMPLAINT (FRAUD; BREACH OF CONTRACT)** upon  **AUDREY GROOM**,  who is a clerk on duty in the office of the Registered Agent and who is authorized to accept service.

**CERTIFICATION OF MAILING:** I certify that on **8/2/2022** a true copy of *SUMMONS AND PLAINTIFF'S FIRST AMENDED COMPLAINT (FRAUD; BREACH OF CONTRACT)* along with a statement regarding the date, time and manner of service was mailed to **EXACT SCIENCES CORPORATION c/o CORPORATION SERVICE COMPANY, Registered Agent** at **1127 BROADWAY ST NE, STE 310, SALEM, OR 97301** by First Class Mail postage paid.

**Description** of Person Served: Age: 25, Sex: F, Race/Skin Color: CAUCASIAN, Height: 5'8", Weight: 200, Hair: BROWN, Glasses: N

I declare I am a resident of the State of Oregon. I am a competent person 18 years of age or older and not a party to or attorney in this proceeding. I certify that the person, firm, or corporation served is the identical one named in this action. I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

STATE OF Oregon

County of Marion
Subscribed and Sworn to before me on the 3rd day
of August , 2022 by the affiant who is
personally known to me or has provided identification.

NOTARY PUBLIC

**Bobby Chandler**
Process Server

Date 8/3/2022

Emerald City Legal Support
1358 Oak Street, #2
Eugene, OR 97401
(877) 600-8807

Our Job Serial Number: EME-2022002822

OFFICIAL STAMP
**OLIVIA A. LUNDIN**
NOTARY PUBLIC-OREGON
COMMISSION NO. 996690
MY COMMISSION EXPIRES FEBRUARY 06, 2024

Exhibit 1
Page 2 of 36

3215



Malstrom's Process Serving Co.
155 Culver Ln S, Salem, Or. 97302
Customer Service is our Specialty!

US POSTAGE
$ 01.29
First-Class
Mailed From 97302
032A 0061855747

Exact Sciences Corporation
c/o Corporation Service Company,
Registered Agent
1127 Broadway St NE, Ste 310
Salem, OR 97301

Exhibit 1
Page 3 of 36



**AST / ALL**
**Transmittal Number: 25331507**
**Date Processed: 08/04/2022**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Carly Conway |
| | Exact Sciences Corporation |
| | 5505 Endeavor Ln |
| | Madison, WI 53719-8803 |
| **Electronic copy provided to:** | Bridget Paul |
| | Nathan Harrill |

| | |
|---|---|
| **Entity:** | Exact Sciences Corporation |
| | Entity ID Number  0628812 |
| **Entity Served:** | Exact Sciences Corporation |
| **Title of Action:** | Christopher Nettleton vs. Exact Sciences Corporation |
| **Matter Name/ID:** | Christopher Nettleton vs. Exact Sciences Corporation (12649865) |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Lane County Circuit Court, OR |
| **Case/Reference No:** | 22CV23719 |
| **Jurisdiction Served:** | Oregon |
| **Date Served on CSC:** | 07/28/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Hutchinson Cox |
| | 541-686-9160 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**Exhibit 1**
**Page 4 of 36**

**null / ALL**
**Transmittal Number: 25381943**
**Date Processed: 08/14/2022**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Carly Conway<br>Exact Sciences Corporation<br>5505 Endeavor Ln<br>Madison, WI 53719-8803 |
| **Electronic copy provided to:** | Bridget Paul<br>Nathan Harrill |

| | |
|---|---|
| **Entity:** | Exact Sciences Corporation<br>Entity ID Number  0628812 |
| **Entity Served:** | Exact Sciences Corporation |
| **Title of Action:** | Christopher Nettleton vs. Exact Sciences Corporation |
| **Matter Name/ID:** | Christopher Nettleton vs. Exact Sciences Corporation (12649865) |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Lane County Circuit Court, OR |
| **Case/Reference No:** | 22CV23719 |
| **Jurisdiction Served:** | Oregon |
| **Date Served on CSC:** | 08/09/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Regular Mail |
| Sender Information: | Hutchinson Cox<br>541-686-9160 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**Exhibit 1**
**Page 5 of 36**

7/19/2022 11:41 AM
22CV23719

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF LANE

| | |
|---|---|
| **CHRISTOPHER NETTLETON**, an individual, | Case No.    22CV23719 |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT (FRAUD; BREACH OF CONTRACT)** |
| vs. | **NOT SUBJECT TO MANDATORY ARBITRATION** |
| **EXACT SCIENCES CORPORATION**, a Delaware Corporation, | **AMOUNT CLAIMED IN PRAYER: $5,180.808.70 (ORS 21.105(1))** |
| Defendant. | |

Plaintiff alleges:

**PARTIES**

1.

Plaintiff Christopher Nettleton, is an individual and a resident of Lane County, Oregon. He was formerly employed by Defendant.

2.

Defendant Exact Sciences Corporation is a Delaware corporation having its principal place of business in Madison, Wisconsin.

**FACTS**

3.

Defendant is a molecular diagnostics company specializing in the detection of early stage cancers through its 2014 product "Cologuard", an early-screening DNA test for colorectal cancer.

///

///

1 – PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR 97440
(541) 686-9160

**Exhibit 1**
**Page 6 of 36**

4.

Defendant has not had a profitable year since its inception in 1994.  It has never paid any amount of federal corporate income tax, being able to show a net loss on its books since 1994.  Despite this, the company has maintained a highly paid workforce, including its CEO Kevin Conroy who is paid a salary of approximately $18,000,000 a year, and has engaged in numerous high-value acquisitions.  Defendant has been able to successfully operate its company, paying millions in salary to its leaders, despite never being profitable as a result of its reputation, which drives the value of its stock.  Defendant's reputation, and thus the value of its stock, depends entirely on the favorable press reports and market reviews.

5.

Plaintiff worked as a sales representative for Pfizer Corporation, one of the world's leading biomedical pharmaceutical companies, for 28 years.

6.

In late 2018, Pfizer entered into a three-year agreement with Defendant to co-promote Defendant's Cologuard stool DNA screening test for colorectal cancer, committing to spend a total of about $70 million on marketing expenses through December 2021.  Plaintiff was one of 450 Pfizer sales representatives assigned to work on the promotion of Defendant's Cologuard product as his primary concentration throughout the entirety of Pfizer's co-promotion agreement.  This team of sales representatives was referred to at Pfizer as Internal Medicine Team 1 ("IMT-1").  Under this agreement, Defendant's staff trained IMT-1 members, including Plaintiff, in the use and benefits of Cologuard. IMT-1 then used its expertise and reach to directly promote the use of Cologuard to its vast network of physicians and health systems.

2 –  PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

Exhibit 1
Page 7 of 36

7.

Upon announcement of the co-promotion agreement between Pfizer and Defendant, Defendant's stock price jumped 20%.

8.

For nearly three years following the execution of Defendant and Pfizer's co-promotion agreement, Plaintiff worked exclusively in his sales duties to directly promote Cologuard to physicians. He performed this work from the base of his home city, Eugene, Oregon.

9.

On information and belief, at some point in 2021, Pfizer decided to significantly alter its participation in the promotion of Cologuard through the use of IMT-1.

10.

On August 25, 2021, Pfizer publicly announced its plan to layoff around 450 sales representatives from IMT-1 (including Plaintiff) who were assigned to the Cologuard product promotion.

11.

Defendant believed that the sudden lack of access to experienced product representatives to contact the physicians and health care organizations in Pfizer's vast network would have a devastating impact on its 2021 fourth quarter stock valuation, as investors' and stakeholders' concerns grew about Defendant's lack of access to the end users of Cologuard. In an effort to avoid the impending severe loss of its stock value, Defendant devised a plan to carry it successfully through the fourth quarter of 2021 with little cost to the company as a whole.

12.

Defendant developed a strategic plan to hire all or nearly all of the former Pfizer IMT-1 members immediately upon their layoff from Pfizer to create the

3 – PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR 97440
(541) 686-9160

**Exhibit 1**
**Page 8 of 36**

1    appearance of a seamless transition of the Cologuard marketing to it from Pfizer.

2    The purpose of this plan was to assure its investors, stakeholders and market

3    analysts that there would be no disruption in the Cologuard sales pipeline.

4                                  13.

5         Because Defendant's value and ability to continue operations relies on the

6    value of its stock, which in turn relies on Defendant's reputation at any given

7    moment, Defendant knew that time was of the essence in securing the assent of

8    the former Pfizer employees to become Exact Sciences employees.

9                                  14.

10        On August 25, 2021, the same date the layoffs were announced by Pfizer,

11   Defendant sent an email to all of the affected Pfizer employees that contained a

12   video link describing an employment opportunity with Exact Sciences and an

13   offer of employment. To secure the hires as quickly as possible, Defendant made

14   promises and assurances to those employees that were designed specifically to

15   obtain their acceptance of the employment offers.  Defendant made the transition

16   from Pfizer employment to Exact Sciences employment as simple as possible, not

17   requiring updated resumes or interviews.  Defendant placed intensely rushed

18   timelines on the employees, demanding a decision within four days of the offers

19   or risk losing the opportunity.

20                                 15.

21        Defendant did not intend to keep the majority of the newly hired

22   employees longer than necessary to ensure a successful fourth quarter.  It did not

23   intend to keep the promises that it made to the former Pfizer employees to

24   convince them to accept the offers of employment.

25   / / /

26   / / /

   4 –  PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 9 of 36**

16.

Plaintiff had been on vacation when the August 25, 2021 email from Defendant was sent.  Upon his return on August 31, 2021, Plaintiff received the first part of his personalized job offer email from Defendant. In that email, Defendant offered Plaintiff the position of Senior Territory Manager.  He was offered a salary package of $161,000 and restricted stock units valued at $42,000 on a four-year vesting schedule.  In that offer to Plaintiff, directly under the title "Senior Territory Manager," Defendant stated: "The role posted here will not require candidate relocation and it is our expectation that all previous Pfizer colleagues continue to serve in their current territories."  Plaintiff was informed in that August 31, 2021 email to click a link in the email and continue to a "brief application"to proceed with the offer on the terms noted.  This application asked him to confirm his legal name, provide his home address, social security number and driver's license number.  Upon completion of the "brief application," the second part of the offer arrived on September 3, 2021 in the form of an e-document to be signed, dated and accepted on or before September 8, 2021.

17.

In the course of the layoffs of the IMT-1, Pfizer offered the affected employees the opportunity to take another open position within the company.  This was of significant importance to Plaintiff because, as noted, he had been with Pfizer for 28 years.  If he stayed with Pfizer, not only would he continue to receive his current salary and generous benefits, but he would also be eligible for retirement with his full pension in three and half more years.  If he left the company to accept Defendant's offer, he would have to forego all of that and would suffer a penalty to his pension value of over $380,000.  However, there was not another commensurate position for Plaintiff in the local area.  To stay with Pfizer, Plaintiff would have had to relocate.

5 – PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 10 of 36**

18.

Defendant's manufactured urgency to the acceptance of its job offers deprived Plaintiff of the opportunity to reflect on the decision, to discuss it with his co-workers and family, and to investigate the alternative positions he could fill at Pfizer to maintain his employment.

19.

Forced to quickly decide, Plaintiff accepted the job offer from Defendant. His primary motivating factor in his decision to do so was Defendant's explicit representation to him that he would not have to relocate.

20.

Plaintiff was 54 years old at the time Defendant offered him the position of Senior Territory Manager and promised him that he would not have to relocate if he accepted the position.  Plaintiff has lived in Eugene, Oregon, for 28 years and his wife has lived in Eugene all of her life and owns a small business in town.  Plaintiff's father, a retired Air Force Colonel, moved to Eugene three years earlier to be close to Plaintiff and Plaintiff's sister.  He lives in an assisted living home six blocks from Plaintiff's house and he relies on Plaintiff for nearly everything, which Plaintiff is happy to provide.  Plaintiff's in-laws also live in Eugene and rely on Plaintiff and his wife for personal help and with their local restaurant and catering business.  Plaintiff knew that the next four or five years of his working life before retirement would likely bring significant changes in his life as his father and in-laws age.  It was of paramount importance to Plaintiff to be in Eugene during those years.  In addition, Plaintiff's doctor, dentist, optometrist, and pharmacy, are all in Eugene, Oregon.  Plaintiff is an active supporter of the Oregon Ducks football, basketball and softball teams, and he is active with his social group.

6 – PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 11 of 36**

21.

Defendant's strategy was successful.  On September 15, 2021, it publicly announced that it had hired approximately 400 new sales representatives, all of whom were former Pfizer IMT-1 employees.  Defendant announced it expected that its decision to hire the former Pfizer employees as its own sales representatives would bring a greater financial benefit than the co-promotional arrangement with Pfizer.  Its stock price spiked 9% on the day the hires were announced.

22.

In response to this news, market analysts informed investors that Defendant's sales team expansion was a net positive for Defendant and would likely drive higher Cologuard sales.  The market analysts were convinced, one writing in a news article released on September 15, 2021, that Defendant's move to hire the former Pfizer reps was "a no-brainer move that should drive faster uptake of Cologuard."  Another analyst gushed that "it is important to note that the expanded team will benefit from having experience selling Cologuard for three years and a familiarity of Exact's existing sales channels.  This is undoubtedly a positive for Cologuard sales and Exact's rep count is the most meaningful driver of Cologuard sales historically."  The article from which these quotations is attached here as Exhibit A.

23.

Plaintiff began working for Defendant as a Senior Territory Manager under the terms of the August 31 and September 3, 2021 job offer on September 13, 2021.  He was required to sign a non-compete agreement and a non-solicitation agreement on September 7, 2021. His (and all other former Pfizer representatives') first day of work for Defendant was September 13, 2021,

7 –  PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

Exhibit 1
Page 12 of 36

1   two days before Defendant alerted the market of its new hires.  Plaintiff worked

2   for the next three months in the same territory he held while working for Pfizer.

3                                      24.

4          Once the positive publicity from the Pfizer hires had accomplished its

5   purpose of inflating Defendant's stock value through the fourth quarter of 2021,

6   Defendant had no need for the extra sales representatives, particularly the senior,

7   high-paid former Pfizer employees.  Defendant knew it could not sustain the

8   added payroll.  Defendant had not intended to keep all of the former Pfizer

9   employees it hired in September 2021, nor had it intended to abide by its

10  assurance that it was Defendant's "expectation that all previous Pfizer colleagues

11  continue to serve in their current territories."

12                                     25.

13         On December 13, 2021, Defendant announced "Project Voyager," a

14  "realignment of sales teams" being conducted by a third-party consultant it had

15  retained to "analyze the data, measure the analytics, and reorganize the sales

16  teams and territories." Now that the fourth quarter had closed, Defendant was

17  going to consolidate territories and move people to where it thought it made the

18  most economic sense for the company.  Plaintiff's manager admitted to Plaintiff

19  that Defendant knew it was likely the reorganization would result in changed

20  territories and relocations, stating that "we expected less than perfect

21  territory/rep pairings" because the changes were made "without local input."

22                                     26.

23         On January 14, 2022, Plaintiff was informed that he had been reassigned to a

24  newly-created Bend, Oregon, territory.  This new territory was comprised of

25  customers all located in Central Oregon, with the closest being 115 miles from his

26  home and the furthest being 420 miles away.  Plaintiff was informed that he had to

8 –  PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 13 of 36**

1   work "in-territory" five days a week.  To do that, he would have to live in-territory,

2   away from his home, five days a week, or he would have to commute between five

3   and 12 hours a day.  Assigning Plaintiff to this territory made no sense.  There were

4   closer reps who could have been assigned, and there were younger, less expensive

5   sales representatives who could have been relocated to work the new territory.

6                                    27.

7          Defendant assigned Plaintiff to the new territory and required him to

8   work in-territory full time in an effort to force him to resign.

9                                    28.

10         Plaintiff tried to work out a resolution with his manager, explaining that it

11  was not possible to spend every working day more than two and half hours (one-

12  way) from his home.  He offered to work in-territory three days, and work

13  remotely for two.  Plaintiff was allowed this concession for a short period of time

14  while his manager tried to determine if a mistake on Plaintiff's territory

15  assignment had been made.  Once it was determined that the new assignment was

16  intentional, Plaintiff was informed that he would need to begin a full in-territory

17  schedule.  Plaintiff was specifically asked by his manager if there were no

18  modification to his territory, would it be a "deal breaker" for him.

19                                   29.

20         In April 2022, Plaintiff presented two reasonable alternatives to his

21  manager in an effort to make his territory assignment tenable.  Plaintiff's

22  manager instructed him to meet with his manager to discuss the options.

23  Plaintiff requested that meeting.

24                                   30.

25         The meeting with Plaintiff's manager's manager was also attended by a

26  representative from Defendant's human resources department.  Upon learning of

9 –  PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1
Page 14 of 36**

1   the additional attendee's role, Plaintiff knew the meeting was not to discuss

2   modifications to his work territory.  The human resource representative told

3   Plaintiff that he could not work a hybrid schedule, and he could not switch

4   territories with another representative.  Plaintiff was informed that the new

5   territory assignments were based entirely on the business needs of the company

6   and that his personal concerns did not matter.  He was told that he could either

7   agree to work five days a week away from home, or he could quit and accept a

8   severance offer of 12 weeks of salary.

9                    31.

10      Defendant had no intention of employing the newly hired sales

11   representatives far into 2022, but it also did not want them to be able to work for a

12   competitor.  Thus, when Defendant hired the Pfizer sales representatives, it required

13   all of them, including Plaintiff, to sign non-competition and non-solicitation

14   agreements.  It required this because it knew that several other companies would

15   shortly be coming to market with similar cancer-screening products to Cologuard.

16   The non-compete agreement Plaintiff is allegedly subject to prevents him from

17   selling a screening diagnostic product to anyone.  The non-solicitation agreement

18   purports to prevent him from selling any product (pharmaceuticals, diagnostic

19   testing, medical devices) to any customer who he had previously sold anything to in

20   the previous 12 months, including those he sold to while working for Pfizer.  That

21   prohibited class of customers, therefore, includes almost all of Oregon, less Portland

22   metro.

23                     32.

24      In addition to the forced relocation of the newly hired representatives,

25   Defendant also endeavored to obtain resignations from a large portion of these

26   employees by assigning them to roles as "virtual representatives."  This job

10 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 15 of 36**

1  requires the sales reps to cold-call physicians full-time from their home. It is a

2  terrible assignment that has resulted in a large portion of the former Pfizer hires

3  to resign. Defendant did not assign Plaintiff to this role because it knew that he

4  only had a few years until retirement and it would allow him to work in Eugene,

5  his top priority, making it unlikely that he would resign. Because enough of the

6  "virtual representatives" did not resign of their own accord, the remaining ones

7  were severed and notified as such on May 17, 2022. 230 total positions were

8  eliminated.

9  33.

10  Plaintiff was instructed to commence his full-time in-territory schedule on

11  April 25, 2022. If he did not, he was informed, he would be fired. Plaintiff

12  respectfully refused that demand and was terminated by Defendant on May 23, 2022.

13  **FIRST CLAIM FOR RELIEF**

14  **(FRAUD)**

15  34.

16  Plaintiff incorporates paragraphs 1-33, above.

17  35.

18  Defendant made a promise and a representation to Plaintiff that he would

19  not have to relocate if he agreed to accept the position of Senior Territory

20  Manager with Defendant. Defendant made that promise and representation to

21  Plaintiff in an effort to induce him to forego his options for continued

22  employment with Pfizer and to instead accept the position with Defendant.

23  When it made that promise to Plaintiff, Defendant had no intent to perform the

24  promise and knew or should have known that its representation was false.

25  Alternatively, Defendant made that promise with a reckless disregard of whether

26  it could perform or not.

11 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

Exhibit 1
Page 16 of 36

36.

Plaintiff reasonably relied to his detriment on Defendant's promise and misrepresentation and gave up: his ability to secure an alternative position with Pfizer: WARN pay; continued higher salary and benefits; his full pension; tenure; and ability to retire in three and a half years.  In further reliance on Defendant's promise and misrepresentation, Plaintiff also gave up his ability to work for anyone else in the only occupation he has known for 28 years by entering into the non-compete and non-solicitation agreements.

37.

Had Plaintiff known that Defendant did not intend to perform its promise or that its representation was false, he would not have accepted Defendant's job offer.  He would have, instead, used the 60 days of WARN time allowance to fully explore the available positions within Pfizer that he could fill for the next three and a half years.  One of those options was a position in Tampa, Florida, where his brother lives, that would have been acceptable.

38.

During his long tenure with Pfizer, Plaintiff was always treated ethically, fairly, and professionally.  It is what he expected was the norm within the industry.  Even during his sudden layoff from Pfizer, he was treated with dignity and presented with a wide variety of options and choices for his benefit.  When Defendant made their initial promise and representation to Plaintiff, it simply never occurred to him that they would be so boldly disingenuous in their employment offer simply for the money, to save its stock value for a very short period of time.  His reliance on Defendant's promises and representations was reasonable.

///

12 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 17 of 36**

39.

As a result of Defendant's fraud, Plaintiff has suffered economic damages in the amount of $1,691,889.62.  Those damages are broken down as follows:

- **Lost Pension:**  Had Plaintiff chosen to pursue Pfizer's offer for reemployment in a different role and remained in that role for three and half more years, he would have been entitled to retirement at age 58 with a full pension.  The value of that pension would have been $951,519.06.  However, because he left early to accept Defendant's offer, he was penalized 4% for every year before age 65, resulting in an economic loss of $380,607.62.

- **Lost Wages:**  Mr. Nettleton would have also earned his Pfizer salary for those three and half more years.  He was making a base salary of $141,652 and averaging $47,000 in annual bonuses, for a total loss of future wages from Pfizer in the amount of $660,282.

- **Lost future wages (beyond age 58):**  The non-solicitation agreement will prohibit Plaintiff from working as a sales representative in nearly all of Oregon for 12 months.  Unable to work until the non-solicitation agreement expires, it is unlikely Plaintiff will find comparable employment upon that expiration.  He is therefore also entitled to additional lost future wages from the age of 58 to 65 in an amount equal to the difference between what he can expect to make at an available position once the non-solicitation agreement expires, and what he would have made had he not entered into the non-solicitation agreement, estimated in the amount of $65,000 per year for seven years, for a total of $455,000.

- **Health Insurance Premiums:**  Plaintiff will also have to pay his entire portion of medical coverage for a period of five years, and then a portion of it that is not subsidized through Pfizer after that.  Had he stayed at Pfizer or

13 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1
Page 18 of 36**

1   had he not been terminated by Defendant, his medical premiums would have

2   been fully paid for through a certain age.  The value of this economic loss will be

3   determined at trial, but is estimated here as $120,000.

4       •    **Lost 401(k) Match:**  Plaintiff would also have been entitled to a

5   4.5% employer match to his 401(k) account from Pfizer from September 2021,

6   through retirement at age 58, period of three and a half years.  This estimated

7   economic loss is valued at an $55,000.

8       •    **Life Insurance Premiums:**  Plaintiff would have received the

9   benefit of paid life insurance for those three and half years, an economic loss

10   valued at $21,000.

11                          40.

12       As a result of Defendant's fraud, Mr. Nettleton was forced to work his

13   new territory from January through May 2022.  That is over five months of time

14   with his father and his wife that he has lost, and five months of stress and

15   depression knowing that Defendant lied to him and that he fell for it, and

16   physical pain from excessive driving and hotel beds.  He has also suffered and

17   continues to suffer anxiety, stress, depression, sleeplessness and worry as a result

18   of Defendant's fraud.  Plaintiff's suffered non-economic damages are valued at

19   $1,000,000.

20                          41.

21       As described above, Defendant made its false promise to Plaintiff for

22   selfish reasons, motivated by money, without concern for who it hurt in the

23   process.  Plaintiff intends to amend his complaint to add a claim for punitive

24   damages.

25   / / /

26   / / /

14 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 19 of 36**

1  **SECOND CLAIM FOR RELIEF**

2  **(BREACH OF CONTRACT)**

3  42.

4  Plaintiff incorporates paragraphs 1-41, above.

5  43.

6  Plaintiff and Defendant entered into an employment agreement, the terms

7  of which were set forth in the August 31, 2021 and September 3, 2021 offer.

8  Those contractual documents are attached here as Exhibit B and incorporated

9  herein.

10  44.

11  Under the terms of that agreement, Defendant promised not to require

12  Plaintiff to relocate if he accepted the offer of employment.  That term was a

13  material term of the employment agreement.  Plaintiff would not have accepted

14  the offer of employment from Defendant without that term included.  Plaintiff

15  accepted the offer of employment on September 7, 2021.

16  45.

17  Defendant breached the terms of the employment agreement by

18  reassigning Plaintiff to a territory that was at all times between 115 and 420 miles

19  from Plaintiff's home and requiring as a condition of his continued employment

20  that he work full-time in that territory.  Requiring Plaintiff to either move or to

21  spend five nights per week away from home to accomplish his job constituted a

22  required relocation in breach of a material term of the employment agreement.

23  46.

24  Plaintiff gave Defendant sufficient notice of its breach and an opportunity

25  to cure.  Defendant refused to cure, and instead terminated Plaintiff's

26  employment.

15 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1
Page 20 of 36**

47.

As a direct result of the breach of contract set forth above, Plaintiff has suffered the economic damages in the amount of $2,488,919.08, broken down as follows:

- **Lost past and future wages:** Plaintiff's initial salary and bonus package was $161,000.  He would have worked for Defendant until age 65, a period of ten years.  Assuming a 6% COLA and merit adjustment each year, Plaintiff has suffered lost past and future wages in the amount of $2,122,108.08.
- **RSUs:** Plaintiff was promised $42,000 in restricted stock units to vest over a period of four years.
- **Health Insurance:** Plaintiff would have received health insurance benefits in the amount of $24,000 per year for 10 years, in the amount of $240,000.
- **Car expense:** Plaintiff would have been entitled to a company car, also available to him for use on personal time as needed.  The value of an annual car lease of approximately $8,400 per year for a period of 10 years is $84,000.
- **Company clothing**: Plaintiff purchased $811.00 in company logo clothing upon his hire by Defendant.

**DEMAND FOR JURY TRIAL**

48.

Plaintiff demands trial by jury on all claims to which he is so entitled.

NOW, THEREFORE, Plaintiff asks that his complaint against Defendant be deemed good and sufficient and that he be awarded judgment as follows:

a.    On his First Claim for Relief for Fraud, an award of economic damages in the amount of $1,691,889.62 and non-economic damages in the amount of $1,000,000; and,

b.    On his Second Claim for Relief for Breach of Contract, an award of economic damages in the amount of $2,488,919.08;

16 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR  97440
(541) 686-9160

**Exhibit 1**
**Page 21 of 36**

1      c.     On all claims, for an award of costs and prevailing party fee, and

2  any other relief the Court deems just and equitable.

3      DATED this 19ᵗʰ day of July, 2022.

4                      HUTCHINSON COX

5

6              By:    s/Andrea D. Coit
                    Andrea D. Coit, OSB #002640

7                    acoit@eugenelaw.com
                    Jonathan M. Hood, OSB #133872

8                    jhood@eugenelaw.com
                    Telephone:  541-686-9160

9                    Facsimile:   541-343-8693
                    Of Attorneys for Plaintiff

10                  Trial Attorney: Andrea D. Coit

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

17 –    PLAINTIFF'S FIRST AMENDED COMPLAINT

HUTCHINSON COX
ATTORNEYS
940 WILLAMETTE STREET, SUITE 400
PO BOX 10886
EUGENE, OR 97440
(541) 686-9160

Exhibit 1
Page 22 of 36



# Exact Sciences Stock Spikes After Primary Care Sales Team Nearly Doubles

Sep 15, 2021 | staff reporter

 *Save for later*

NEW YORK – Exact Sciences' stock climbed steadily on Wednesday after the company said that it had significantly expanded its primary care sales team to increase adoption of its at-home colon cancer screening test, Cologuard.

By midafternoon, the company's shares saw an increase of nearly 9 percent to $105.31 on the Nasdaq with more than 1.4 million shares traded, above the average daily volume for the stock of slightly less than 1.3 million shares.

In a filing with the US Securities and Exchange Commission on Wednesday, Exact said that it hired approximately 400 new sales representatives, nearly doubling the size of its primary care field sales team to more than 850 reps. The company also disclosed that the new employees are former Pfizer sales reps who were displaced from their former jobs in late August and who had been promoting Cologuard under an agreement between Exact and Pfizer. Exact said it offered the displaced Pfizer sales reps the opportunity to join its team in full-time sales roles promoting Cologuard, and that the vast majority of those offers were accepted.

Exact and Pfizer originally entered into an agreement to copromote Cologuard in August 2018. Under the terms of the deal, Pfizer joined Exact's sales reps in reaching out to physicians and health systems and actively participated in the Cologuard marketing campaign in an attempt to increase the test's adoption rate. Pfizer was to pay a share of the marketing expenses and got a 50 percent share of the gross profits above an agreed upon baseline.

In its SEC filing, Exact said it expects the newly hired reps to be more productive as the company's own employees, rather than as Pfizer's, as they'll be better able to coordinate their interactions with healthcare providers with current Exact sales reps.

Exact also noted that Pfizer is still currently promoting Cologuard, but that it's doing so with a smaller sales team than it was before — because of the firm's internal policies related to COVID-19, Pfizer's sales reps are not making in-person sales calls in 41 states. Exact added that it is in discussions with Pfizer that could result in material changes to their promotion agreement.

In notes to investors, analysts viewed the sales team expansion as a net positive for Exact and said it would likely drive higher sales of Cologuard.

Canaccord Genuity analyst Kyle Mikson said that while Exact's spending on its sales force will increase,

this should be partially offset by a reduction in the promotion fee it pays to Pfizer. Further, he added, although Pfizer had been "an excellent partner to Exact," the partnership's benefits weren't as clear in recent quarters, given the substantially reduced in-person promotion by Pfizer's reps.

"The new headcount could add incremental expenses in 2022 (we estimate less than $50 million)" for Exact, he wrote. "That said, we think the sales force expansion will be a net positive over time. For example, the new reps could contribute to Exact's other screening areas outside Cologuard. The company will also now have more control/influence over the reps."

William Blair analyst Brian Weinstein concurred, calling Exact's announcement a "no-brainer move that should drive faster uptake of Cologuard."

The incremental cost of that the company will incur in 2022 to add these sales reps is insignificant when compared to the benefit they'll be in helping to drive faster adoption of Cologuard, Weinstein added. He further noted that this will also allow the company flexibility when it looks to eventually market other similar products.

And SVB Leerink analyst Puneet Souda noted that sales reps typically require six months to nine months of training in order to reach full efficiency, so hiring these particular reps will also save Exact the time and trouble it would normally have to train new sales team members to market its particular products.

"It is important to note that the expanded team will benefit from having experience selling Cologuard for three years, and a familiarity of [Exact's] existing sales channels," he wrote. "This is undoubtedly a positive for Cologuard sales and [Exact] as rep count is the most meaningful driver of Cologuard sales historically."



Filed Under    **Business News**    **Molecular Diagnostics**    **North America**    **Exact Sciences**    **stock price**

Privacy Policy.  Terms & Conditions.  Copyright © 2022 GenomeWeb, a business unit of Crain Communications.  All Rights Reserved.

**Subject:**       Join Exact Sciences - Application and Benefit Information Provided Here
**Date:**          Tuesday, August 31, 2021 at 4:39:13 AM Pacific Daylight Time
**From:**          Ask Exact
**Attachments:** 2021_Total_Rewards_Summary-US.pdf

Thank you for your interest in joining Exact Sciences!

Since we started working together, we've increased the number of people who have used Cologuard from just over a million to over six million people. You have helped lead the way to getting more patients screened with your professionalism, your skills, and the deep relationships that you have across the country. We deeply respect all that you have done and are beyond excited to discuss having you join our team.

Our goal is to make the hiring process as seamless as possible for you. Exact Sciences will not require candidates to update a current resume or participate in interviews. For procedural purposes, you will be asked to upload a resume, but in the spirit of efficiency, we will also accept in its place, a current performance scorecard, cover letter, latest performance review, or resume. The document you select to upload will not impact the offer you will receive, but will allow us to finalize the recruitment process. We ask that you complete this brief application prior to close of business on **September 3rd, 2021**. by clicking on the link here:

[Sr. Territory Manager](#)

The role posted here will not require candidate relocation and it is our expectation that all previous Pfizer colleagues continue to serve in their current territories.

Given the expedited nature and volume of this recruitment process, all job offers will be extended at target. With that noted, all employees who accept an offer on or before September 8th, will be included in the Exact Sciences Annual Comp Review process which will take place in Q1 of 2022.

The target compensation for the **Sr. Territory Manager** role is as follows:

> **Gross Base Salary (paid bi-weekly):** $115,000 per year
> **Sales Incentive Plan (paid quarterly):** $46,000 annual target
> <u>**Equity Incentive/New Hire Grant:**</u> $42,000 (RSUs with a target value of 4-year vesting schedule)
> **Total Annual Comp at Target: $171,500**
>
> *Total Annual Comp includes Base Salary, SIP at target, & 25% of equity grant

Once your application is received and reviewed, offers will be extended on **September 7th, 2021** commensurate to the above, to candidates who meet the position qualifications and requirements listed below.

- No more than two moving violations in the past 36 months, and no unresolved license revocation or suspension issues.
- Effective October 1st all Exact Sciences employees working at our U.S. sites, along with our employees who visit healthcare offices, will be required to be vaccinated for COVID-19.

We understand that you likely have many questions. To help provide as many answers as possible, we will be hosting Q&A sessions on August 30th & September 1st. All candidates will be invited to attend these optional sessions, hosted by Kevin Conroy and Pat Setji.

As a preview, we have attached a summary of benefits for your consideration as you navigate the application process.

For immediate questions, please feel free to utilize the email address here: **AskExact@exactsciences.com**. Within 24 hours, a member of our HR team will reach out to you with additional information.

The anticipated start date for accepted offers will be September 13th, 2021 to ensure continuity of pay for our impacted Pfizer colleagues.

**This will require that all offers be accepted by close of business on September 8th, 2021.**

A sincere thank you for your interest in Exact Sciences. We hope that you consider joining our team, we would be honored if you would, and we know that we can move mountains together.

This message and accompanying documents are covered by the electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, may be covered by the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and may contain confidential information or protected health information intended for the specified individual(s) only. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, copying, or the taking of any action based on the contents of this information is strictly prohibited. If you have received this communication in error, please notify sender immediately by e-mail, and delete the message.

# EXACT SCIENCES



# 2021
## Total Rewards Summary-US







Exhibit B
Page 3 of 12

v26022021

**Exhibit 1**
**Page 27 of 36**

    

**Our Total Rewards strategy helps us attract, retain, evaluate, recognize, and develop the talented people we need to compete in our industry and achieve our business objectives. We offer you a competitive salary and performance-driven compensation, while maintaining fiscal responsibility. Our Total Rewards program also includes comprehensive benefits, work-life initiatives, performance and recognition programs, and career growth opportunities.\***

### VACATION
Regular, full-time employees accrue 17 vacation days during their first year of employment. Part-time employees and/or those hired mid-year receive prorated vacation days.

### SICK AND SAFE TIME
Regular, full-time employees are allotted 10 days of sick time in January each year. Part-time employees and/or those hired mid-year receive prorated sick time.

### PAID HOLIDAYS
Regular, full-time employees are offered 12 paid holidays annually, which is a combination of 9 company-designated and 3 personal holidays. Part-time employees and/or those hired mid-year receive prorated holiday time.

### PARENTAL LEAVE PROGRAM
Exact Sciences believes in the importance of family bonding following a child's birth or adoption and provides 12 consecutive weeks of paid parental leave for eligible employees.

### PAID VOLUNTEER TIME OFF (VTO)
Eligible employees are provided 16 hours of paid VTO to participate in volunteering activities of their choice (to be validated, some restrictions apply).

### MEDICAL/Rx
To meet the needs of Exact Sciences' diverse workforce, Exact Sciences offers three medical plan options through UnitedHealthcare: a High-Deductible Health Plan (HDHP), Primary Provider Organization Plan (PPO) and Exclusive Provider Organization Plan (EPO). OptumRx prescription drug coverage is included with all medical plan options through UnitedHealthcare. For Northern California employees, Exact Sciences provides two additional options under the medical plan (an HDHP and a Health Maintenance Organization (HMO) through Kaiser Permanente, both of which also include prescription drug coverage.

### HEALTH SAVINGS ACCOUNT (HSA)
An HSA is available through OptumBank. If you enroll in an HDHP option under the medical plan, Exact Sciences contributes up to $1,250 to your HSA if you elect employee-only coverage, or up to $2,500 if you elect employee + dependent(s) coverage. You can also make pre-tax contributions to your HSA.

### FLEXIBLE SPENDING ACCOUNTS (FSAS)
Exact Sciences offers a Healthcare FSA, Limited Purpose Healthcare FSA, Dependent Care FSA, and Transit/Parking Commuter Benefits, which are administered by Discovery Benefits.

### DENTAL
Exact Sciences offers dental coverage through Delta Dental with nationwide coverage. Eligible employees may choose from two dental plan options: a Core Plan or Buy-up Plan for additional coverage.

### VISION
Exact Sciences provides eligible employees with the opportunity to enroll in vision coverage through EyeMed or VSP. Exact Sciences' vision coverage includes annual eye exams, affordable options for prescription glasses or contacts, and even discounts for laser vision correction.

### CRITICAL ILLNESS BENEFIT
Exact Sciences offers voluntary critical illness coverage through Voya, which helps cover out-of-pocket expenses in the event of a serious illness by paying a lump sum benefit.

### ACCIDENT BENEFIT
Exact Sciences offers voluntary accident coverage through Voya, which provides a lump sum benefit to help cover the gap between what the medical plan covers and what you owe out-of-pocket if you or a family member is injured.

*\*Eligibility requirements vary by benefit and are more fully described in the plan documents, policies, and summary plan descriptions (as applicable). Review the plan documents, policies and summary plan descriptions or contact hr@exactsciences.com if you have questions regarding eligibility for benefits.*



**EMPLOYEE ASSISTANCE PROGRAM (EAP)**
Exact Sciences cares about employees' health and well-being, both on and off the job, and offers the EAP through SupportLinc, which includes telephonic and online support services 24/7 for eligible employees and their household members.

**BUSINESS TRAVEL ACCIDENT INSURANCE**
Exact Sciences provides business travel accident insurance through Chubb that includes a full range of insurance coverage and traveler assistance to eligible employees traveling for business.

**BASIC LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT (AD&D) INSURANCE**
Exact Sciences provides basic life insurance and AD&D insurance through The Standard to provide financial protection to eligible employees and their beneficiaries in the event of death or a covered injury.

**SUPPLEMENTAL LIFE AND AD&D INSURANCE**
Eligible employees have the option to purchase additional supplemental life and AD&D insurance through The Standard for themselves and their spouse/domestic partner and/or children.

**DISABILITY INSURANCE**
Exact Sciences offers company-paid short- and long-term disability insurance through The Standard, which provides partial income replacement for eligible employees who are disabled by a qualifying injury or sickness (including pregnancy).

**INDIVIDUAL DISABILITY INSURANCE**
This benefit is provided to executive employees in addition to group disability coverage.

**401(K) RETIREMENT PLAN WITH COMPANY WITH MATCH**
The Exact Sciences 401(k) Plan provides eligible employees with a great way to save for retirement and includes a discretionary annual matching contribution. Company matching contributions have historically been made in the form of company common stock.

**NEW HIRE & ANNUAL EQUITY AWARDS**
Exact Sciences provides a stock plan that permits discretionary grants of equity awards to certain eligible employees. Under current grant practices, eligible employees generally receive both an initial and an annual grant of restricted stock units (RSUs) to be settled in shares of the company's common stock pursuant to the company's stock plan.

**NON-QUALIFIED DEFERRED COMPENSATION PLAN**
The Exact Sciences Corporation Executive Deferred Compensation Plan (Exact Sciences EDCP) is an optional savings vehicle which allows certain eligible highly compensated employees to defer a portion of their compensation for the future.

**EMPLOYEE STOCK PURCHASE PLAN (ESPP)**
The ESPP provides eligible employees with the opportunity to purchase company common stock on an after-tax basis at a 15% discount from a pre-determined price through payroll deductions, subject to pre-established limits.

**TUITION REIMBURSEMENT**
Eligible employees may request to participate in the Tuition Reimbursement and External Development Program to help offset costs for approved educational programs.

**ADOPTION ASSISTANCE**
Employees adopting a child may be eligible for financial reimbursement through the company's Adoption Assistance Program

**EXACT GIVES**
A charitable company donation match program is available to eligible employees.

**PREPAID LEGAL**
Exact Sciences offers prepaid legal benefits through LegalEase, which provides access to a national network of attorneys for common non-employment related legal needs.

**ONSITE AMENITIES**
Fitness and dining amenities are available onsite at three Exact Sciences locations – two in Madison, WI and one in Redwood City, CA.



### WELLNESS POINTS PROGRAM
Exact Sciences believes in offering opportunities to be well and live well. Eligible employees may participate in various activities and events throughout the year to earn individual points toward award dollars.

### FITNESS REIMBURSEMENT PROGRAM
Exact Sciences provides several options for eligible employees to be reimbursed for ongoing fitness-related memberships.

### FITNESS CLASSES
Free onsite, virtual and on-demand group exercise, walking and meditation offerings are available. Onsite and virtual personal training is available for a fee. The fee is eligible for reimbursement under the Fitness Reimbursement Program.

### HEALTH RISK ASSESSMENT (HRA) PROGRAM
Exact Sciences offers a free HRA Program, which includes biometric screenings and health assessments for eligible employees and their eligible spouses/domestic partners. As a partner in the healthcare industry, we believe it is important for our employees to be informed about their health and potential health risks.

### COMMUTER BENEFITS
Exact Sciences has a variety of commuter benefit options for employees that work at our facilities:

- Madison, WI – Free Bus Pass

- Redwood City, CA – Free shuttle ride

- Phoenix, AZ – Parking Garage reimbursement

### PET INSURANCE
Voluntary pet insurance through Nationwide is available to eligible employees for dogs, cats, birds, and a variety  of exotic pets, at a discounted rate.

### AUTO/HOME INSURANCE
Voluntary auto/home insurance is offered through an arrangement with MetLife to eligible employees. Depending on your individual circumstances, automobile and homeowner's insurance may be discounted up to 10%.

### CARE.COM PREMIUM MEMBERSHIP
A free premium membership for Care.com is available to help employees find qualified child and elderly caregivers, house cleaners and pet sitters.

This document contains selected highlights of Exact Sciences' employee benefits and equity compensation programs.  If any statement herein, or any other communication, conflicts with the applicable plan documents and award agreements, the applicable plan documents and award agreements will control. Exact Sciences reserves the right to amend, modify or terminate its employee benefits and equity compensation programs in any respect and at any time, and neither its benefits or equity compensation programs, nor your participation therein, will be considered a contract for future employment.



# 2021 Employee Contributions

Below are the new hire employee contribution amounts for benefits effective January 1, 2021 - December 31, 2021.

## United Healthcare (UHC) Medical Plan Options

| Bi-Weekly Employee Contributions | HDHP | PPO | EPO |
|---|---|---|---|
| **Employee Only** | $0 | $23.91 | $43.69 |
| **Employee + Spouse/DP** | $0 | $54.99 | $100.49 |
| **Employee + Child(ren)** | $0 | $45.42 | $83.01 |
| **Family** | $0 | $71.72 | $131.07 |

## Kaiser Medical Plan Options (Northern CA Only)

| Bi-Weekly Employee Contributions | HDHP | HMO |
|---|---|---|
| **Employee Only** | $0 | $24.00 |
| **Employee + Spouse/ DP** | $0 | $66.00 |
| **Employee + Child(ren)** | $0 | $37.38 |
| **Family** | $0 | $125.08 |

## Dental Plan Options

| Bi-Weekly Employee Contributions | CORE | BUY-UP |
|---|---|---|
| **Employee Only** | $2.68 | $3.94 |
| **Employee + Spouse/DP** | $5.35 | $7.89 |
| **Employee + Child(ren)** | $5.75 | $8.48 |
| **Family** | $9.77 | $14.40 |

## Vision Plans Options

| Bi-Weekly Employee Contributions | EyeMed | VSP |
|---|---|---|
| **Employee Only** | $0.55 | $0.55 |
| **Employee + Spouse /DP** | $1.00 | $1.00 |
| **Employee + Child(ren)** | $1.06 | $1.05 |
| **Family** | $1.63 | $1.62 |

Internal Revenue Service regulations mandate that the value of Exact Sciences' contributions to healthcare benefits for domestic partners and their children be considered taxable income (also called imputed income) to the employee. This means that if you elect coverage for your domestic partner and/or domestic partner's child(ren) under the benefit plans, you will pay income taxes on Exact Sciences' contribution towards your domestic partner's and/or domestic partner's child(ren)'s coverage, as applicable.
**NOTE:** Employees with domestic partner coverage will see imputed income on each pay check.



# Employee Rates

## Supplemental Life Insurance

| Employee & Spouse/DP Bi-Weekly Rates per $1,000 of Coverage | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | <25 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70-74 | 75-79 | 80+ |
| Employee Rates | $0.023 | $0.028 | $0.037 | $0.042 | $0.048 | $0.078 | $0.125 | $0.198 | $0.323 | $0.600 | $1.038 | $1.154 | $1.770 |
| Tobacco Employee Rates | $0.043 | $0.052 | $0.064 | $0.064 | $0.086 | $0.130 | $0.190 | $0.371 | $0.489 | $0.701 | $1.207 | $1.726 | $1.770 |
| Spouse/ DP Rates | $0.028 | $0.032 | $0.037 | $0.055 | $0.083 | $0.143 | $0.235 | $0.369 | $0.577 | $1.029 | $1.846 | $3.046 | $6.166 |

| Child(ren) Bi-Weekly Rates | |
|---|---|
| Child(ren) Rates | $0.078 per $1,000, no matter how many children you're covering |

## Supplemental AD&D Insurance

| Employee, Spouse/DP and Child Bi-Weekly Rates per $1,000 of Coverage | |
|---|---|
| Employee, Spouse/DP, Child | $0.0115 per $1,000 |

## Prepaid Legal

| Bi-Weekly Rates | |
|---|---|
| Family | $7.38 |

## Critical Illness Benefit

| Rates |
|---|
| Rates are calculated based on age, tobacco use, amount of coverage elected, and other such factors, and will be provided within Workday (HRIS system) at the time of enrollment. |

## Accident Benefit

| Bi-Weekly Rates | |
|---|---|
| Employee Only | $3.86 |
| Employee + Spouse/DP | $8.56 |
| Employee + Child(ren) | $8.88 |
| Family | $13.58 |

*This document contains selected highlights of the company's employee benefit plans. If any statement herein, or any other communication, conflicts with the applicable plan documents, the plan documents will govern. Exact Sciences reserves the right to amend, modify or terminate its benefit plans in any respect and at any time, with or without notice, and neither its benefit plans, nor your plan participation, will be considered a contract for future employment.*







441 Charmany Drive
Madison, WI 53719

**JOB OFFER ACCEPTANCE**

September 3, 2021

Christopher Nettleton
1133 Cedar Ridge Dr
Eugene , OR  97401

Dear Christopher ,

On behalf of Exact Sciences, (the "Company"), I am pleased to extend to you an offer of employment for the position as listed below. In making this offer, we are expressing our enthusiastic support for the skills and commitment you will bring to our team. We are pleased to offer you the following:

Position Title:  Sr Territory Manager

Status: Full Time , Exempt

Start Date:  9/13/2021  (or other date mutually agreed upon in writing)

Base Salary:  Your (gross) base salary will be $4,423.08 /biweekly ($115,000.08) on an annualized basis) and will be paid in accordance with the Company's normal payroll procedures.  Your base salary is intended to pay for all hours worked during each pay period, regardless of your scheduled or actual hours.  Please note, if your start date is after January 1st, you will be eligible for a prorated annual increase during the annual review process in the next calendar year following your start date.

Signing Bonus: You shall be eligible to receive a one-time signing bonus of twenty thousand dollars ($20,000.00) (gross). The signing bonus will be paid on the first payroll following your start date. Should you terminate employment voluntarily within six (6) months of the date of hire, you agree to repay the signing bonus within (30) days of our written correspondence stating your repayment obligation.

Sales Incentive Plan: You shall be eligible to receive a cash bonus as determined by the Company each calendar year.  The annual target variable compensation amount you are eligible to earn shall be $46,000 (forty six thousand dollars). This bonus will be earned and paid in accordance with the Sales Incentive Plan applicable to your position.

Vehicle Program: At the start of employment, you will be eligible to participate in the Company's DRIVE program, subject to the terms and conditions of any applicable Company policies. To be eligible for a rental car or fleet vehicle, you are required to participate in periodic driver's record checks, maintain an acceptable driving record, and maintain and submit documentation of a current driver's license and sufficient insurance. Spousal or partner use of the long-term rental car and/or fleet vehicle is allowable

subject to approval by HR as well as  compliance with the driving record and driver's license requirements for all participants in the DRIVE program. Please note that the Company reserves the right to change or discontinue the vehicle program at any time. The Company will also provide a company credit card that may be used for business-related fuel expenses.

Equity Incentives and Other Long-Term Compensation:  You will receive an initial new hire grant of restricted stock units (RSUs) with a $42,000 (forty two thousand)  targeted value, to be settled in shares of the Company's stock based on the 30-day trading average pursuant to the Company equity plans. The grant will be contingent upon your commencement of employment.  The grant date of your award will be the first to occur of the following dates following your first date of employment with the Company: January 15, March 15, May 15, July 15, September 15 or November 15 (or the closest trading day prior to the applicable 15th day of the month if that 15th day is not a trading day). Twenty-five percent (25%) of the shares underlying your grant will vest each year, on the anniversary of the grant date, subject to your continued employment.

The Board of Directors, upon the recommendation of the Compensation Committee, may grant to you from time to time, options to purchase shares of the Company's common stock, and/or other equity awards including, without limitation, restricted stock, both as a reward for past individual and corporation performance, and as an incentive for future performance.  Such options and/or other awards, if awarded, will be pursuant to the Company's then current equity incentive plan.  In order to be eligible to receive a portion of an annual performance grant for any calendar year, you must be employed with the Company for at least one full quarter and remain employed with the Company through the grant date.

Benefits:  You will be entitled to participate in the insurance (including medical, vision, dental, life and long-term disability), 401k, and other benefit programs that are generally provided to similarly situated employees of the Company, all in accordance with the rules and policies of the Company as to such matters and the plans established therefore.  Note that part-time employment may limit your eligibility to participate in certain benefit programs.

Non-Disclosure & Non-Competition Agreements: As a condition of your employment, you will be required to sign a copy of our "Non-Disclosure & Invention Agreement" and "Non-Compete & Non-Solicitation Agreement" prior to or on your start date.  It is the Company's policy to fully respect the rights of previous employers in their proprietary or confidential information.  All employees are prohibited from disclosing or using for the Company's benefit any confidential or proprietary information he or she may have acquired as a result of previous employment.  By signing this offer letter, you are agreeing to comply with this prohibition.

By signing this offer letter, you are also representing that you are not subject to any contractual or other obligation (such as a non-competition or non-solicitation agreement) that may prohibit you from being employed by the Company or performing any of the responsibilities of your position.

Contingencies:
- As a condition of your employment, you must provide legally required documentation to show proof of employment eligibility in the United States.  Accordingly, we request that you provide us with the appropriate document(s) for this purpose within 72 hours of your employment date.
- Your employment is contingent upon the Company's successful completion of your background and reference check.
- Your employment is contingent on receipt of a copy of your COVID-19 Vaccination Record Card and being fully vaccinated prior to your first day, should your position require you to be onsite at any of our US locations, attend any offsite meetings/events, or visit provider/healthcare offices on behalf of Exact Sciences. The Company will engage in an interactive process to evaluate the availability of a reasonable accommodation for an employee who has a qualifying medical condition or status that is a contraindication for vaccination or who objects to being vaccinated on the basis of sincerely-held religious beliefs. Contact leaves@exactsciences.com to request an accommodation.
- Please note that the terms and conditions set forth herein relating to grants of restricted stock and

common stock are subject to, and conditioned upon, approval by the Company's Compensation Committee.
- As a condition of employment, you will be required to successfully complete all sales certification requirements.  Exact Sciences will make a reasonable accommodation available if necessary to assist an employee with a disability to satisfy this requirement.
- In connection with your employment, the Company may need to disclose your name and other information (such as your social security number) in the course of its business operations – for example, to be able to seek reimbursements from Medicare/Medicaid or for employee benefits or compliance purposes.  By accepting employment with the Company, you are agreeing that the Company may submit your information as needed for its business operations.

This letter supersedes all prior written or oral communications, agreements or understandings regarding employment by the Company.  The Company is an employer-at-will and this offer of employment and the details contained within should not be construed as a contract of continuing employment.

We are extremely excited at the prospect of you joining our team and confident you will represent our values of Integrity, Teamwork, Accountability, Innovation and Quality. If this arrangement is acceptable to you, please indicate your acceptance of the terms of this employment offer by e-signing this letter.

Sincerely,

Anna Sullivan
Sr Manager, Talent Acquisition

By selecting 'accept', I acknowledge that I have read the offer letter presented to me and accept all employment terms.

**Accept**  Christopher Nettleton 9/7/2021 4:38 PM
(checking the checkbox above is equivalent to a handwritten signature)